COMMONWEALTH vs. JACK MATTHEW ROSENBERG.

Suffolk. December 5, 1990. - June 6, 1991.

Present: LIACOS, C.J., ABRAMS, O'CONNOR, & GREANEY, JJ.

*Mental Health. Practice, Civil,* Proceeding to extend commitment of juvenile, Commitment of mentally ill person. *Jurisdiction,* Juvenile court. *Juvenile Court,* Jurisdiction. *Psychotherapist. Evidence,* Communication between patient and psychotherapist, Judicial discretion. *Due Process of Law,* Mental health, Vagueness of statute. *Constitutional Law,* Double jeopardy, Equal protection of laws.

The judge at a proceeding conducted in 1989 pursuant to G. L. c. 120, §§ 16-20, properly denied the defendant's motion for a mistrial based on jury panel members' having been left in a court hallway, prior to the taking of evidence, with members of a group known as "Parents of Murdered Children" who wore buttons bearing the name of the group, where the judge conducted a voir dire of the jurors and found there was no prejudice, dismissed one juror who had sat particularly close to the group, and ordered confiscated all the buttons. [352]

A criminal defendant's conversations with a psychologist who was not a "psychotherapist" as then defined in G. L. c. 233, § 20B, before amended by St. 1989, c. 270, § 2, were not protected by the statutory psychotherapist-patient privilege and were admissible in a proceeding conducted pursuant to G. L. c. 120, §§ 16-20. [353]

Where there was no agency relationship shown between a criminal defendant's therapist, who did not qualify as a psychotherapist for purposes of the statutory privilege set forth in G. L. c. 233, § 20B, and a psychotherapist who allegedly supervised the therapist, there was no basis, in a proceeding conducted pursuant to G. L. c. 120, §§ 16-20, for excluding the expert opinion of the psychotherapist which was based in part on the nonprivileged communications between the defendant and the therapist. [353-354]

The judge at a 1989 proceeding conducted pursuant to G. L. c. 120, §§ 16-20, properly exercised his discretion to admit testimony of an expert psychiatric witness which was based on an evaluation of the defendant made three years before the trial and a review of the defendant's records since that time. [355]

In a proceeding conducted pursuant to G. L. c. 120, § 20, the judge's instructions to the jury with respect to the basis of the defendant's ex-

pert witness's opinion did not improperly impinge on the jury's fact finding function. [355-356]

Evidence introduced in a proceeding conducted pursuant to G. L. c. 120, § 20, was sufficient to warrant the jury to find beyond a reasonable doubt that the defendant was dangerous by reason of mental illness. [356-358]

There was no merit to a defendant's contention that the two-tier procedure for extending commitment of an individual to the Department of Youth Services under G. L. c. 120, §§ 16-20, was unconstitutional as it exposed him to double jeopardy. [358]

General Laws c. 120, § 19, as effective in 1989, permitting the extended commitment of an individual to the Department of Youth Services was not unconstitutionally vague with respect to multiple extensions. [359-360]

A defendant committed in 1989 to the Department of Youth Services pursuant to G. L. c. 120, §§ 16-20, did not demonstrate that he was denied due process of law by being given inadequate treatment or an unnecessarily restricted commitment. [360]

A defendant committed to the Department of Youth Services pursuant to G. L. c. 120, §§ 16-20, was not denied equal protection of the laws by reason of any differences between commitment procedures under that statute and those under G. L. c. 123. [360-362]

The judge in a proceeding conducted pursuant to G. L. c. 120, §§ 16-20, did not deprive the defendant of due process by failing to instruct the jury that dangerousness by reason of mental illness must be predicated on evidence of a "recent" overt act. [362-363]


APPLICATION to review an order to extend commitment, filed in the West Roxbury Division of the District Court Department on December 13, 1988.

On appeal to the Boston Division of the Juvenile Court Department, the case was tried before *Mark E. Lawton*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Matthew H. Feinberg* (*Matthew A. Kamholtz* with him) for the defendant.

*Nijole Makaitis*, Assistant District Attorney, for the Commonwealth (*William J. Connors*, for the Department of Youth Services, with her).

LIACOS, C.J. In 1984, at the age of fourteen, the defendant, Jack Matthew Rosenberg, was placed in the custody of the

Department of Youth Services (department), after he
pleaded guilty to delinquency by reason of murder and kid-
napping.[1] As the defendant approached his eighteenth birth-
day, the department issued an order extending his commit-
ment. Following a bench trial and a jury-waived trial de
novo, the order was confirmed. In 1988, the department is-
sued another order extending commitment. See G. L. c. 120,
§ 19 (1988 ed.) (requiring new order within two years). The
order was confirmed after a bench trial in the West Roxbury
Division of the District Court Department, the original com-
mitting court. The defendant sought a jury trial de novo in
the appellate session of the Juvenile Court Department. See
G. L. c. 120, § 20 (1988 ed.). A jury found beyond a reason-
able doubt that the defendant was dangerous by reason of
mental illness, and confirmed the department's order ex-
tending commitment of the defendant. A judge of the Juve-
nile Court confirmed the order in accordance with the jury
verdict. This appeal by the defendant challenges his extended
commitment to the custody of the department pursuant to
G. L. c. 120, §§ 16-20 (1988 ed.).[2] We allowed the defend-
ant's application for direct appellate review. We affirm.

The facts adduced at the jury trial are as follows. The
Commonwealth presented the testimony of four witnesses
duly qualified as experts. Dr. Carol N. Maurer, a supervising
psychiatrist at a Pennsylvania treatment center where the de-
partment placed the defendant, diagnosed the defendant as
being mentally ill by reason of a bipolar affective disorder in
remission.[3] Dr. Maurer also stated in her diagnosis that the
defendant suffered from a sexual identity disorder, pedo-

---

[1]The defendant sexually assaulted a five year old boy and drowned him
when the boy threatened to disclose the incident.

[2]General Laws c. 120, §§ 16-19, as appearing in St. 1990, c. 267, §§ 6-
9, effective December 5, 1990, do not apply to this case as the defendant's
extended commitment occurred before the effective date of the amend-
ment.

[3]A bipolar affective disorder, Dr. Maurer explained, is characterized by
dramatic mood swings from a manic or highly excited state, to a depressed
state. The witness explained that the disorder is a chronic mental illness,

philia, and a narcissistic personality disorder. In her opinion, neither pedophilia nor a narcissistic personality disorder was a mental illness, but, she testified, the latter could intensify a bipolar affective disorder. Based on her diagnosis, Dr. Maurer stated her opinion that the defendant was dangerous by reason of mental illness and was "capable, when frustrated, of carrying out the same act [the murder of a child] again."[4]

The Commonwealth's second witness, Dr. Albert J. Scott, who holds a doctoral degree in education, evaluated the defendant on one occasion at the treatment center. He diagnosed the defendant as suffering from a bipolar affective disorder and a borderline personality disorder with antisocial tendencies. Dr. Scott classified both disorders as mental illnesses and considered the defendant dangerous to himself and others as a result of these disorders.[5]

Dr. Craig Latham, a forensic psychologist with the Department of Mental Health, had examined the defendant on one occasion. He testified that the defendant was a danger to the public, that he "had not received any treatment" for his "sex offender" behavior, and, according to staff reports, had been "committing repeated acts of sexual aggression and manipulative behavior toward younger residents in the program." In Dr. Latham's opinion, the defendant exhibited "a pattern of behavior that, if left unchecked or untreated, would continue," and that the "circumstances [for which the defendant was originally committed] could occur again." Dr. Latham opined, however, that there was no evidence of bipolar disorder and that pedophilia was not a mental illness. He

---

so, while the defendant exhibited none of the features of the disorder when evaluated, the illness was still present but was in remission.

[4]Dr. Maurer based her diagnosis and opinion on her personal evaluation of the defendant, the evaluation conducted by Dr. Scott, another witness for the Commonwealth, and on the defendant's records and communications with therapists at the treatment center.

[5]Dr. Scott based his diagnosis and opinion on the results of a battery of clinical tests, a clinical interview with the defendant, and a review of the defendant's records.

concluded that the defendant was not mentally ill and was not subject to commitment.[6]

The Commonwealth presented, as its final witness, Dr. George L. Hardman, a psychiatrist who had examined the defendant once three years before the trial. The doctor's diagnosis of the defendant included a bipolar affective disorder in remission and a narcissistic personality disorder, both of which Dr. Hardman classified as mental illnesses. Based on his review of the defendant's records prior to the trial and on the reports of Drs. Maurer, Scott, Latham, and Seghorn, Dr. Hardman stated his opinion that the defendant still suffered from these disorders and still presented a danger.

The defendant presented the testimony of one witness, Dr. Theoharis Seghorn, whose diagnosis and opinion were based on a personal evaluation of the defendant and interview with the staff at the treatment center conducted in conjunction with Dr. Latham, and on evaluation reports in the defendant's file, as well as on the results of a penile plethysmograph examination (discussed *infra*). This witness concluded that the defendant was not mentally ill and was not dangerous by reason of mental illness.

The defendant alleges the following errors occurred at the jury trial: (1) The judge abused his discretion in failing to declare a mistrial when members of the jury panel were left in a court hallway, prior to the taking of evidence, with members of a group calling themselves "Parents of Murdered Children"; (2) the judge erred in admitting the testimony of Dr. Scott in violation of the psychotherapist-patient privilege; (3) the judge erred in admitting testimony of Dr. Maurer to the extent that her testimony relied on confidential conversations between the defendant and his therapist, Timothy Blackson, allegedly an agent of Dr. Maurer; (4) the

---

[6]Dr. Latham based his diagnosis and opinion on one evaluation of the defendant and a meeting with the staff at the treatment center, both of which were conducted in conjunction with the defendant's expert, Dr. Theoharis Seghorn. Dr. Latham also reviewed the evaluations of Doctors Maurer, Scott, and Seghorn, the defendant's records from the Department of Youth Services, and the records from the treatment center.

judge erred in admitting the testimony of Dr. Hardman, as it was based on stale information; (5) the judge improperly instructed the jury regarding Dr. Seghorn's reliance on the results of a penile plethysmograph examination; (6) there was insufficient evidence to prove that the defendant was dangerous by reason of mental illness; and (7) the judge should have excluded testimony regarding personality disorders because such disorders are not mental illnesses under 104 Code Mass. Regs. § 3:01 (a) (1986). The defendant also contends that the two-tier de novo review of a department order extending commitment violated his right not to be put in jeopardy twice and his right to due process; that G. L. c. 120 does not authorize multiple extensions, and that multiple extensions violated his right to due process; that the commitment procedure under G. L. c. 120 denied the defendant his right to equal protection of the laws; and finally, that commitment without proof of a recent overt act demonstrating dangerousness deprived the defendant of his due process rights.

1. *Motion for a mistrial.* The defendant claims that the judge should have declared a mistrial when it was discovered that members of the jury had been seated in a hallway among members of a group known as "Parents of Murdered Children," all of whom wore buttons bearing the name of the group. The defendant fails to cite any authority to support this claim.

The judge conducted a voir dire examination of the jurors in accordance with the procedure prescribed in *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978), to determine whether any possible prejudicial information had reached any juror. Having found no prejudice, see *Commonwealth* v. *Palmariello*, 392 Mass. 126, 142 (1984) (judge has right to rely on juror statements), the judge took the added precaution of dismissing one juror who sat particularly close to the group. The judge also ordered all the buttons confiscated. The denial of the motion for a mistrial was not an abuse of the judge's discretion.

2. *Evidentiary Issues.*

a. *Psychotherapist-patient privilege.* The defendant argues that it was error to admit the testimony of one expert witness, Dr. Scott, a psychologist who evaluated the defendant, because Dr. Scott failed to give the defendant the appropriate warning prescribed in *Commonwealth* v. *Lamb*, 365 Mass. 265 (1974), prior to evaluating him. The judge ruled that the defendant's conversations with Dr. Scott did not fall within the statutory bounds of the psychotherapist-patient privilege, G. L. c. 233, § 20B (1988 ed.), because Dr. Scott has a doctoral degree in education, not a doctoral degree in the field of psychology.[7] "The patient-psychotherapist privilege has never been recognized at common law. *Commonwealth* v. *Gordon*, 307 Mass. 155, 158 (1940). We are thus not inclined here to extend the patient-psychotherapist privilege beyond the bounds established by the Legislature. See *Usen* v. *Usen*, 359 Mass. 453, 457 (1971)." *Commonwealth* v. *Mandeville*, 386 Mass. 393, 409 (1982). See *Adoption of Diane*, 400 Mass. 196, 201 (1987). There was no error.

The defendant contends that the judge erred in allowing Dr. Maurer, a psychiatrist who qualifies as a psychotherapist under G. L. c. 233, § 20B,[8] and who allegedly supervised the defendant's therapist, to testify to her opinion of the defend-

---

[7]General Laws c. 233, § 20B (1988 ed.), provides in part: "The following words as used in this section shall have the following meanings: -
" . . . .
" 'Psychotherapist', a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry or a person who is licensed as a psychologist by the board of registration of psychologists; *provided, however, that such person has a doctoral degree in the field of psychology* or is a registered nurse licensed by the board of registration in nursing whose certificate of registration has been endorsed authorizing the practice of professional nursing in an expanded role as a psychiatric nurse mental health clinical specialist, pursuant to the provisions of section eighty B of chapter one hundred and twelve" (emphasis supplied).
The definition of "psychotherapist" in G. L. c. 233, § 20B, was amended through St. 1989, c. 270, § 2. The amendment was enacted after the period relevant to this appeal.

[8]See note 7, *supra.*

ant's mental state which was based in part on communications between the defendant and his therapist.[9] The defendant argues that the therapist was an agent of Dr. Maurer, and, therefore, communications between the defendant and his therapist should be privileged to the extent communications between the defendant and Dr. Maurer would be privileged.

The therapist, Timothy Blackson, does not qualify independently as a psychotherapist under G. L. c. 233, § 20B, because he holds neither a medical degree in psychiatry nor a doctoral degree in the field of psychology. We have recognized the possibility of extending this statutory privilege to an agent of a psychotherapist where there exists a confidential relationship between the patient and the psychotherapist, see *Commonwealth v. Mandeville, supra* at 409; see also *Commonwealth v. Clemons,* 12 Mass. App. Ct. 580, 586-587 (1981), and the therapist-psychotherapist relationship also meets the requirements of an agency relationship. Cf. *Kirkpatrick v. Boston Mut. Life Ins. Co.,* 393 Mass. 640, 645 (1985) (agency relationship arises when one consents to act on behalf of another and subject to her control); Restatement (Second) of Agency § 1 (1958). There was no such agency relationship shown between Blackson and Dr. Maurer. Additionally, the evidence indicates that the defendant was told on numerous occasions, by his therapist and by his case worker from the department, that conversations with the therapist were not confidential. The defendant testified on voir dire that he had been so informed. We are therefore not inclined to extend the privilege to the conversations between the defendant and his therapist, Blackson.[10]

---

[9]We note that the evidence does not warrant a finding that Blackson was under the direct supervision of Dr. Maurer; rather, he was a staff therapist at the institution to which the defendant was committed.

[10]Compare the attorney-client privilege, where privilege is destroyed when communications are made in the presence of a non-necessary agent of the attorney or client. See *Drew v. Drew,* 250 Mass. 41, 44-45 (1924). See also P.J. Liacos, Massachusetts Evidence 185 (5th ed. 1981 & Supp. 1985). Contra *Blount v. Kimpton,* 155 Mass. 378 (1892). Also, we have stated that "[c]ommunications between an attorney and his client are not

b. *Stale testimony.* The defendant contends that the judge should not have admitted the testimony of Dr. Hardman, who examined the defendant on one occasion over three years before the trial. Dr. Hardman based his opinion on that evaluation and a review of the defendant's records since that time. A judge has broad discretion in determining the admissibility of testimony concerning an evaluation which occurred at some time in the past. See *DeJesus* v. *Yogel*, 404 Mass. 44, 47 (1989). The period of time between an evaluation, here Dr. Hardman's clinical examination of the defendant in 1986, and the testimony of a witness is a factor which the trier of fact may weigh in assessing the credibility of the testimony. The judge did not abuse his discretion by admitting testimony based on an evaluation conducted three years earlier, as well as a review of the defendant's records since that time. Additionally, the judge could have considered trial testimony by Dr. Latham that "nothing about [the defendant's] particular pattern of thinking has changed." There was no error.

c. *The judge's limiting instructions regarding basis of expert's opinion.* The defendant claims that the judge improperly instructed the jury that Dr. Seghorn's opinion of the defendant's mental state was based "[t]o a great degree" on the results of a penile plethysmograph examination,[11] which, the judge told the jury, was not commonly used, but which has a "fair degree of reliability." On the basis of this language, the defendant asserts that the judge essentially told the jury they could discount Dr. Seghorn's testimony. The defendant exaggerates the effect of these words.

---

privileged, though made privately, if it is understood that the information communicated is to be conveyed to others." *Peters* v. *Wallach*, 366 Mass. 622, 627 (1975).

[11]A penile plethysmograph is an electronic device consisting of a pressure-sensitive ring, which is placed around a subject's penis and measures and records increases in the subject's penis size in response to audio and visual sexual stimuli. The degree of the subject's arousal is inferred from changes in penis size as measured by the device. The examination is conducted in a controlled environment and in accordance with specific test protocol.

"A trial judge may properly bring to the jury's attention issues of fact and conflicts of testimony. He may point out factors to be considered in weighing particular testimony. Nothing . . . precludes, or could properly. preclude, such guidance where the judge clearly places the function of ultimate appraisal of the testimony upon the jury." *Barrette* v. *Hight*, 353 Mass. 268, 271 (1967).

Review of the trial transcript reveals that, while the results of the plethysmograph test may not have had great significance in Dr. Seghorn's over-all evaluation of the defendant, the results were a basis of his opinion as to the defendant's sexual orientation. The transcript reveals that the judge clearly and extensively instructed the jury that they, not the judge, were the ultimate fact finders who determined what weight and effect to give testimony. There was no error.

d. *Sufficiency of the evidence.* The defendant claims there was insufficient evidence for a jury to find beyond a reasonable doubt that he was dangerous by reason of mental illness. We review the record in the light most favorable to the Commonwealth to determine whether a jury reasonably could find beyond a reasonable doubt that the defendant was dangerous by reason of mental illness. *Commonwealth* v. *Barboza*, 387 Mass. 105, 110, cert. denied, 459 U.S. 1020 (1982). See *Commonwealth* v. *Burbank*, 388 Mass. 789, 797 (1983).

The standard for extending an individual's commitment to the control of the department is whether that individual "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality." G. L. c. 120, § 17. In *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 523 (1986), we held that, because G. L. c. 120 and c. 123 "are concerned with the same general subject matter," c. 123's definitions of similar words would apply to c. 120. A "mental or physical deficiency, disorder or abnormality" in c. 120 is defined by the term "mental illness" in c. 123. *Id.* at 524.[12] Chapter 120's term

---

[12]The Department of Mental Health defines "mental illness" in 104 Code Mass. Regs. § 3.01 (a) (1986) as follows: "For purposes of involun-

"physically dangerous to the public" is defined by "likelihood of serious harm" in c. 123. *Id.*[13]

There was evidence before the jury that the defendant had sexually assaulted and murdered a five year old boy, that nothing about the defendant's pattern of thinking had changed, and that the defendant was "capable, when frustrated," of committing the same act of violence again. There was also evidence that the defendant had attempted suicide and had demonstrated sexual aggression and manipulative behavior. Each of the Commonwealth's witnesses testified that the defendant was a danger to himself and others. Three of those four witnesses testified that the defendant was dangerous by reason of mental illness. There was expert testimony indicating that the defendant suffered from bipolar affective disorder in remission, which is a mood disorder impairing his judgment, a narcissistic personality disorder, which is also a mood disorder, and pedophilia. The expert witnesses disagreed about whether a narcissistic personality disorder is a mental illness. That is a question of fact for the jury.

"Judicial experience with psychiatric testimony makes it abundantly clear that it would be unrealistic to treat an opinion . . . by an expert on either side of . . . [an] issue as conclusive. . . . The law should not, and does not, give the

---

tary commitment and the determination of criminal responsibility, 'mental illness' shall mean a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life, but shall not include alcoholism which is defined in M.G.L. c. 123, § 35."

[13]General Laws c. 123, § 1, defines "[l]ikelihood of serious harm" as: "(1) a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."

opinions of experts on either side of . . . [an] issue the benefit of conclusiveness, even if there are no contrary opinions introduced at the trial." *Commonwealth* v. *DeMinico*, 408 Mass. 230, 235 (1990), quoting *Commonwealth* v. *Lamb*, 372 Mass. 17, 24 (1977). There was sufficient evidence for a jury reasonably to find beyond a reasonable doubt that the defendant was dangerous by reason of mental illness.

3. *Constitutional Issues.*

a. *Constitutionality of the two-tier review system for extending a Department of Youth Services commitment order.* According to the defendant, the two-tier procedure for extending commitment of individuals to the department placed the defendant in double jeopardy. The defendant acknowledges that the two-tier system currently in place in the District Court Department of the Trial Court of this Commonwealth has been found constitutional even where there was insufficient evidence presented at the bench trial to warrant a conviction. See *Justices of the Boston Municipal Court* v. *Lydon*, 466 U.S. 294 (1984); *Lydon* v. *Commonwealth*, 381 Mass. 356, cert. denied, 449 U.S. 1065 (1980). The defendant argues that the present appeal is distinguishable, because in *Lydon* the defendant had the option of a jury trial in the first instance or a bench trial with a right to seek a jury trial on a determination of guilt at the bench trial, whereas in this case the defendant was given no option to choose a jury trial in the first instance.

The issue of a defendant's option was not determinative for the United States Supreme Court in *Justices of the Boston Municipal Court* v. *Lydon, supra*, nor was it determinative in this court's holding in *Gibson* v. *Commonwealth*, 381 Mass. 372 (1980), cert. denied, 449 U.S. 1089 (1981), and *A Juvenile* v. *Commonwealth (No. 2)*, 381 Mass. 379, cert. denied, 449 U.S. 1062 (1980). Contrast *Gibson* v. *Commonwealth, supra* at 378 (Liacos, J., dissenting, with whom Abrams, J., joined). The Court held that the process does not expose a defendant to double jeopardy. There is no merit to the defendant's double jeopardy claim under the decided case law.

b. *Multiple extensions of commitment under G. L. c. 120,
§ 19, and due process.* The defendant contends that the stat-
ute permitting the extended commitment of an individual to
the department is impermissibly vague on the issue of multi-
ple extensions. General Laws c. 120, § 19, set out in the mar-
gin,[14] applies when the department has already secured the
confirmation of one extension order. When a person commit-
ted as a juvenile has that commitment extended, the depart-
ment must, according to G. L. c. 120, § 19, make a new
order and new application for review if the department
deems the individual "physically dangerous to the public be-
cause of the person's mental or physical deficiency, disorder
or abnormality," the requirement for extending commitment
under § 17. "Such orders and applications may be repeated
at intervals as often as in the opinion of the department may
be necessary for the protection of the public, except that the
department shall have power, in order to protect other chil-
dren and adolescents, to transfer the custody of any person
eighteen years of age or older to the department of correction

[14]General Laws c. 120, § 19 (1988 ed.), provides:

"When an order of the department is confirmed as provided in section
eighteen, the control of the department over the person shall continue, sub-
ject to the provisions of this chapter; but, unless the person is previously
discharged in accordance with section six (*e*), the department shall, within
two years after the date of such a confirmation in the case of persons com-
mitted as wayward children or delinquent children, or within five years
after the date of such a confirmation in the case of persons committed
after conviction in criminal proceedings, make a new order and a new ap-
plication for review thereof in accordance with the provisions of section
seventeen. Such orders and applications *may be repeated at intervals as
often as in the opinion of the department may be necessary for the protec-
tion of the public*, except that the department shall have power, in order to
protect other children and adolescents, to transfer the custody of any per-
son eighteen years of age or older to the department of correction for
placement in the appropriate institution.

"Every person shall be discharged from the control of the department at
the termination of the period stated in this section unless the department
has previously acted as therein required, and shall be discharged if the
court fails to confirm the order as provided in section eighteen." (Emphasis
supplied.)

for placement in the appropriate institution." G. L. c. 120,
§ 19.[15] The statute clearly permits at least two extensions.

The defendant next argues that he was denied due process
of law because the department is not capable of providing
the defendant with the proper treatment for his mental ill-
ness. The cases the defendant cites do not support his pro-
position that a mentally ill person has a constitutional right
to be committed to one State agency rather than another.
Instead, the cases hold that a person committed for treat-
ment of mental illness has a due process right to receive
treatment, see *O'Connor* v. *Donaldson*, 422 U.S. 563 (1975);
*Rouse* v. *Cameron*, 373 F.2d 451 (D.C. Cir. 1966); *Wyatt* v.
*Stickney*, 325 F. Supp. 781 (M.D. Ala. 1971), and the right
to receive the least restrictive or least burdensome control
necessary to pursue rehabilitation. See *Thompson, petitioner*,
394 Mass. 502, 505-507 (1985); *Commonwealth* v. *Nassar*,
380 Mass. 908, 917-918 (1980). There was *no* evidence that
the defendant received inadequate treatment or that commit-
ment to the department was unnecessarily restrictive. See
*Youngberg* v. *Romeo*, 457 U.S. 307 (1982); *Commonwealth*
v. *Davis*, 407 Mass. 47, 49-51 (1990); *Newton, petitioner*,
357 Mass. 346, 352-353 (1970); *Doe* v. *Gaughan*, 808 F.2d
871, 877 (1st Cir. 1986). Cf. G. L. c. 120, § 6 (1988 ed.).
The defendant was not denied his right to due process of law.

c. *Equal protection.* The defendant's third constitutional
challenge is that the procedural differences between commit-
ments under c. 120, §§ 16-20, and commitments under
c. 123, which have as the same purpose the treatment of

---

[15]Section 19 permits, but does not require, the department to transfer an
individual over the age of eighteen to the Department of Correction for the
protection of other individuals in the custody of the department. Further-
more, G. L. c. 120, § 14 (1988 ed.), provides that "the department may
make application to the proper court for a new commitment to the appro-
priate agency in accordance with law" for any person committed to the
department who is found to be mentally ill. Again, the language is permis-
sive, and does not *require* transfer out of the department. The Legislature
obviously considered the circumstance of a mentally ill person in the de-
partment's custody, and left it to the department to decide whether to
transfer the individual.

mentally ill persons, see *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 523 (1986), denied the defendant equal protection of the laws. Specifically, the defendant indicates that the c. 123 commitment process is initiated by the superintendent of a Department of Mental Health facility, whereas the c. 120 commitment process is initiated by a "bureaucratic order." Compare G. L. c. 123, § 7 (*a*) (1988 ed.), with G. L. c. 120, § 17. The defendant contends that a superintendent of a Department of Mental Health facility is more qualified to determine the committability of an individual for mental health reasons than is the Department of Youth Services. The defendant also challenges the venue of the committing court, claiming that a "c. 123 court" is more appropriate than a "c. 120 court." Compare G. L. c. 123, § 7 (*a*) (District Court in jurisdiction of superintendent), with G. L. c. 120, § 17 (original committing court). These differences are insignificant and do not rise to the level of an equal protection concern.

Last, the defendant notes that commitment under c. 123 is initially for a period of six months, or in some circumstances, one year, with later extensions for no greater than one year. G. L. c. 123, § 8 (*d*) (1988 ed.). The defendant, however, asserts incorrectly that an individual may be committed under c. 120 for two years without review. General Laws c. 120, § 5 (*b*) (1988 ed.), requires "periodic reexamination of all persons within [the department's] control." The reexaminations "may be made as frequently as the department considers desirable, and shall be made with respect to every person at intervals not exceeding one year." *Id.* Failure to reexamine an individual within one year entitles that individual to petition the committing court for an order of discharge. G. L. c. 120, § 5 (*d*) (1988 ed.). As stated in *Department of Youth Servs.* v. *A Juvenile, supra* at 523, c. 120 and c. 123 "are concerned with the same general subject matter" and "have as their purpose the protection of others from physical harm and the treatment of the mentally ill person." Given that the statutes have the same purpose, yet one chapter initially commits an individual for a shorter time period,

G. L. c. 123, § 8 (*d*), there must be a rational basis for dis-
tinguishing between those civilly committed as dangerous by
reason of mental illness under c. 123, and those committed as
dangerous by reason of mental illness after commitment to
the Department of Youth Services. See *Baxstrom* v. *Herold*,
383 U.S. 107, 111 (1966); *Doe* v. *Gaughan, supra* at 880-
881. A short interval for review of a recently committed per-
son's condition while in the control of the Department of
Mental Health assures familiarity with that individual and
the state of his condition. An individual whose commitment
is extended by action of the Department of Youth Services
under c. 120, has been in the control of the department for
some time. The department's familiarity with that individ-
ual's condition is assured. There is a rational basis for this
differentiation. The defendant was not denied equal protec-
tion of the laws.[16]

   d. *Evidence of dangerousness and due process.* The de-
fendant argues that the judge deprived him of due process by
failing to instruct the jury that dangerousness by reason of
mental illness must be predicated on evidence of a recent
overt act. To support his contention, the defendant cites
*Lynch* v. *Baxley*, 386 F. Supp. 378, 391 (M.D. Ala. 1974);
*Lessard* v. *Schmidt*, 349 F. Supp. 1078, 1093 (E.D. Wis.
1972), vacated on other grounds, 414 U.S. 473 (1974); and
*Commonwealth* v. *Nassar*, 380 Mass. 908, 916-918 (1980).
The holdings in *Lessard* and *Lynch* are no longer persuasive,
however, in light of *United States* v. *Sahhar*, 917 F.2d 1197
(9th Cir. 1990), cert. denied, 111 S. Ct. 1591 (1991) (con-                .
sidering involuntary civil commitment standard). The *Sah-
har* court held that "a finding of 'substantial risk' [of causing
bodily injury] . . . may be based on *any* activity that evinces
a genuine possibility of future harm to persons . . . . Whether
that activity occurred recently is but one factor for the
[finder of fact] to consider in weighing the evidence." (Em-

---

[16]We express no opinion regarding the ability of an individual to obtain
review of an ongoing commitment, as only the issue of the commitment
itself is before the court. See *Andrews, petitioner*, 368 Mass. 468 (1975).

phasis in original. Citation omitted.) *Id.* at 1207. "Nor do we believe that due process requires a finding that defendant recently committed dangerous acts. In establishing the clear and convincing evidence standard for civil commitments, [the Supreme Court, in *Addington* v. *Texas*, 441 U.S. 418, 427 (1979),] held that commitment must be based on 'something more serious than is demonstrated by idiosyncratic behavior.' . . . Otherwise, *Addington* placed no due process limits on the range of evidence a [trier of fact] may consider in reaching its decision." (Citation omitted.) *Id.* at 1207-1208. Further, contrary to the defendant's assertion, our decision in *Commonwealth* v. *Nassar, supra,* did not recognize a requirement of a recent overt act as a basis for finding a "likelihood of serious harm." Rather, referring to *Lessard* v. *Schmidt, supra,* we said that a showing of imminent *future* harm was linked to the enhanced standard of proof beyond a reasonable doubt, and that to "the degree that the anticipated physical harm is serious — approaches death — some lessening of a requirement of 'imminence' seems justified." *Id.* at 917. There is no requirement that a "likelihood of serious harm" be established by evidence of a *recent* overt act. Nor does the statutory definition of "likelihood of serious harm," G. L. c. 123, § 1, require a recent overt act. The judge made no error in excluding such a requirement from his instructions to the jury.

*Judgment affirmed.*