Gants, Ralph D., J.
The plaintiff TransOcean Capital, Inc. (“TransOcean”) has moved to compel the deposition testimony of defendant Glenn Fortin (“Fortin”) and attorney John Batter III (“Batter”) regarding communications between Fortin and Batter as to Fortin’s plans to find outside investors to purchase *598 the outstanding shares of a corporation known as EZ Lube, Inc. (“EZ Lube”). After hearing, for the reasons detailed below, TransOcean’s motion to compel is DENIED IN PART AND ALLOWED IN PART.
BACKGROUND
While the propriety of Fortin’s conduct is greatly at issue, there is less dispute as to the circumstances that preceded Fortin’s discussions with Batter. In June 2001, Gulf Investment House of Kuwait (“GIH”) hired Fortin and co-defendant John Beauclair (“Beauclair”) to serve as the founding principals of TransOcean, a wholly-owned subsidiary of GIH, that was to identify possible corporate acquisitions for GIH and, with GIH’s approval, execute these transactions and manage the acquired companies on behalf of GIH. Fortin served on TransOcean’s Board of Directors as Managing Director and Secretary. Beauclair was TransOcean’s Executive Director.
In November 2003, Fortin and Beauclair learned that EZ Lube was looking to be acquired, and they explored this investment opportunity on behalf of GIH. Several weeks later, they learned that EZ Lube had chosen to be purchased by another private equity firm.
In August 2004, however, Fortin and Beauclair learned that this private equity firm and EZ Lube had broken off negotiations, and that EZ Lube was once again looking for a corporate suitor. On August 7, 2004, Fortin and Beauclair informed GIH in writing that EZ Lube was again available for acquisition and began to gather updated information regarding EZ Lube. On August 17, 2004, Fortin and Beauclair sent GIH an email recommending further pursuit of the acquisition, and asked for an additional budget of $10,000 to negotiate a letter of intent with EZ Lube and perform preliminary due diligence. On August 31, 2004, Fortin and Beauclair asked GIH to provide certain approvals needed to proceed with the deal by September 8, 2004, but GIH did not provide those approvals. On September 13, 2004, Fortin and Beauclair asked GIH in an email whether they should continue to work on the EZ Lube transaction. The next day, GIH replied to this email, criticizing Fortin and Beauclair for not providing sufficient information as to the proposed deal, and failing to address GIH’s requests for additional information and analysis. On or around September 17, 2004, Fortin and Beauclair introduced EZ Lube to buyers other than GIH, including J.W. Childs, Associates, L.R, a Boston private equity firm (“Childs”). Without the knowledge or approval of GIH, they also incorporated an independent investment vehicle, Turbo Acquisition, Inc. (“Turbo”), which on September 17,2004 entered into a letter of intent to acquire all the outstanding shares of EZ Lube.
On September 21, Matthew Hayes (“Hayes”), TransOcean’s Vice President, spoke to Fortin and Beauclair of his concerns about their executing the letter of intent with EZ Lube and shopping the EZ Lube investment opportunity to investors other than GIH, and threatened to resign that day unless Fortin obtained legal advice to see whether what Fortin and Beauclair were doing was legal. Fortin authorized Hayes to call an attorney Hayes knew at Hale and Dorr, Mark Johnson, to see if Johnson could locate another attorney in his firm with experience in labor and employment law who could provide them with legal advice. Fortin and Beauclair prepared a written description of the background leading up to the transactions at issue and set forth various questions regarding the legality of what they proposed doing. Johnson referred the matter to Batter, his colleague at Hale and Dorr, and gave Batter’s email address and telephone number to Hayes. Fortin authorized Hayes to email Batter the document with the background information and questions.
Batter spoke to Fortin for roughly an hour on September 23, after receiving the written background material, and a voicemail and email from Fortin asking Batter to call him. Both Fortin and Batter have invoked the attorney-client privilege regarding the content of this telephone call, as well as the voicemails and emails that followed. At least two of the emails, however, one from Fortin to Batter on September 26 and another on September 27 from Batter to Fortin, were recovered by TransOcean from its computer server, and through that means were read by TransOcean and its attorneys.
Immediately after his telephone call with Batter on September 23, Fortin notified Childs that he was postponing until the following week a meeting they had scheduled for the following day because Fortin wanted to get a firm indication from GIH as to whether it intended to go forward with the EZ Lube acquisition. Childs suggested that the meeting go forward as scheduled based upon its verbal commitment to defer to GIH if GIH still wished to pursue the transaction. Later on September 23, Fortin sent an email to Childs in which he wrote, in pertinent part:
. . . The good news is that, after consultation with counsel, we are willing to provide the detailed information on the company tomorrow or tonight, upon the signing of a mutually agreeable CA. The bad news is that the proposed solution regarding the meeting, while perfectly logical, would not cure the issue that counsel has, which is that any meeting, which necessarily involves reactions and feedback, would taint our communications with our other investor in seeking their final denial.
Therefore, we propose that we would send you full information on the opportunity for your review tomorrow and over the weekend, but without any feedback from your firm until we have received a clear waiver, at which point we could also have a meeting if still desired. This will allowyour firm to proceed in full with the evaluation of the opportunity without any delay.
On September 24, Fortin and Beauclair notified GIH for the first time that it had formed Turbo and executed a letter of intent with EZ Lube.
*599 DISCUSSION
To establish that the attorney-client privilege applies to a communication, the burden rests with the party asserting the privilege to establish:
1. the existence of the attorney-client relationship;
2. that “the communications were received from a client during the course of the client’s search for legal advice from the attorney in his or her capacity as such”;
3. that “the communications were made in confidence”; and
4. that “the privilege as to these communications has not been waived.”
In the Matter of the Reorganization of Electric Mutual Liability Ins. Co. Ltd. (Bermuda) (“Emlico"), 425 Mass. 419, 421 (1997).
Here, there is little dispute that the first two elements have been satisfied. This Court finds that there was an attorney-client relationship between Batter (as the attorney) and Fortin, Beauclair, and Hayes (as the clients, whom Batter reasonably understood he was jointly representing in providing Fortin with the solicited advice). While Batter had not yet been formally retained as an attorney and was never paid, the law is clear that legal advice provided during preliminary discussions that explore the possibility of an attorney-client relationship are protected by the attorney-client privilege. Bays v. Theran, 418 Mass. 685, 690 (1994) (an attorney-client relationship “may be established through preliminary consultations, even though the attorney is never formally retained and the client pays no fee”). This Court also finds that Fortin sought and Batter provided legal advice during their various communications together, both oral and written.
The crux of TransOcean’s challenge to the invocation of attorney-client privilege here rests on the third and fourth elements. As to the third element, Trans-Ocean contends that the written email communications between Fortin and Batter were not made in confidence because Fortin used his TransOcean email address in sending and receiving those emails on TransOcean’s computer system. This Court, in another case, has observed:
An attorney-client communication is not confidential and therefore not protected by the attorney-client privilege if:
the communication was made in the presence of a third party who was not a necessary agent of the attorney or the client; see Commonwealth v. Rosenberg, 410 Mass. 347, 354 n.10 (1991); or
the communication was intended to be made privately but the client reasonably should have understood from the circumstances of the communication that it was likely to be overheard; see Commonwealth v. Petty, 4 Mass. L. Rptr. 611 (Mass.Super.Ct. 1995) (attorney-client communication in busy clerk’s office is not protected by privilege because client could have no reasonable expectation of privacy when he chose to converse there); or
the communication was made privately but it was understood that the information communicated was to be conveyed to others. See Commonwealth v. Rosenberg, 410 Mass. at 354 n. 10; Peters v. Wallach, 366 Mass. 622, 627 (1975).
National Economic Research Associates, Inc. et al. v. David Evans et al., Suffolk Civ. No. 04-2618-BLS2, Memorandum and Order on Plaintiffs Motion to Compel, at 5-6 (August 2, 2006) (21 Mass. L. Rptr. 337). In that case, this Court found that, if the company’s Policies and Procedures Manual plainly warned that e-mails on the network could be read by the company’s network administrators, the client could not reasonably expect to communicate in confidence with his private attorney if the client e-mailed his attorney using his company e-mail address through the company’s computer system. Id. at 6. This Court shall apply the same reasoning here, and therefore shall consider whether Fortin received fair warning that TransOcean could read his emails, including otherwise privileged emails. This Court finds that he did not.
TransOcean did not have its own Policies or Procedures Manual or Employment Manual setting forth the Company’s policy regarding the review of emails on the Company’s network. Instead, TransOcean retained TriNet Group, Inc. (“TriNet”) to handle various human resources matters for TransOcean, such as payroll. TriNet apparently maintained on its web site an Employee Handbook that purportedly provided information to the employees of its customers regarding the conditions of their employment. TriNet’s Employee Handbook stated that all communications that are transmitted, received, or stored in the Company’s information systems belong to the Company and are to be used only for job-related purposes, unless otherwise authorized by the Company. The Handbook also warns that the Company “may monitor use of any systems and equipment to ensure proper usage.” If TransOcean had expressly informed its directors, officers, or employees that it was adopting TriNet’s Employee Handbook as its own and invited them to read the Handbook on TriNet’s web site, or if TransOcean had provided its directors, officers, or employees with a copy of the Handbook, thus implicitly adopting its provisions, then this Court would find that Fortin had waived his attorney-client privilege with respect to his email communications with Batter because he knew or should have known that the Company retained the right to read these emails.
TransOcean, however, neither explicitly nor implicitly adopted this Employee Handbook as its own. Nor did it inform any director, officer, or employee that the governing Employee Handbook could be found on TriNefis web site. Nor is there any information in the record to suggest that Fortin had even seen the guidance in TriNet’s Employee Handbook or understood that TriNet even issued an Employee Handbook. Nor is there any *600 evidence that Fortin understood that TransOcean had a policy or practice of searching its office computers, or that there was any Company policy barring the use of the Company’s email for personal use.[1] Since the evidence does not demonstrate that Fortin reasonably should have recognized that his personal email communications with Batter were accessible to TransOcean because he used its email address, this Court finds that they were made in confidence and that Fortin did not waive his attorney-client privilege by using the Company’s email address and computer system.
As to the fourth element, the attorney-client privilege may be waived, in whole or in part, as to confidential attorney-client communications if the client chooses to inform another of the advice provided by counsel. Here, Fortin in his September 23 email to Childs chose to inform Childs of the advice that Fortin had received from his counselthat any meeting with Childs would taint Fortin’s communications with “our other investor” (plainly, GIH) in seeking its final denial of the EZ Lube acquisition. If Fortin had simply stated, as he had in the previous sentence of this email, that Fortin had decide to pursue a particular course after consultation with counsel, he would not have waived the privilege, because he would not have communicated the substance of the advice he received from counsel. By choosing to describe that advice, he waived his right to protect the advice under the privilege because the advice, having been communicated to a third party, was no longer confidential.[2]
Having found that Fortin waived the privilege as to this advice, this Court must now determine the scope of that waiver. A client does not waive his attorney-client privilege as to all communications with counsel simply because he reveals to a third party one aspect of the advice provided by counsel. See Neitlich v. Peterson, 15 Mass.App.Ct. 622, 625-28 (1983). He does, however, waive the privilege as to that aspect of the otherwise privileged advice. Id. (when witness discloses otherwise privileged attorney-client communication in trial testimony, the waiver is limited to the subject matter of that disclosure). Pragmatically, if a client reveals an attorney’s advice, his adversary may ask the attorney directly about that advice and determine whether the actual advice given was fairly reflected in the client’s description of that advice. Here, this means that Batter and Fortin may be questioned at deposition about the advice Batter provided to Fortin as to:
whether Fortin should meet or otherwise communicate with Childs regarding the EZ Lube acquisition, and
whether that meeting or communication with Childs should be delayed until GIH rejected the EZ Lube acquisition.
Without this additional discovery, a factfinder reading the unprivileged email would reasonably understand that it accurately reflected the advice Fortin received from counsel, which may or may not be true. Certainly, if Fortin mischaracterized his attorney’s advice in the email to Childs, TransOcean should be able to elicit the information necessary to reveal that mischaracterization.
ORDER
After hearing, TransOcean’s motion to compel the deposition testimony of Fortin and attorney Batter is ALLOWED to the extent that Batter and Fortin may be questioned at deposition about the advice Batter provided to Fortin as to:
whether Fortin should meet or otherwise communicate with Childs regarding the EZ Lube acquisition, and
whether that meeting or communication with Childs should be delayed until GIH rejected the EZ Lube acquisition.
Beyond that, the motion to compel is DENIED.

This Court recognizes that, in the summer of 2004, Beauclair directed the information-technology consulting firm TransOcean retained to remove certain business and personal information from TransOcean’s servers because Beauclair and Fortin feared that Samer Alhaj, an Executive Vice-President of GIH who was GIH’s designated member on the TransOcean Board of Directors, would access this information if he visited TransOcean’s offices when Fortin and Beauclair were out of the country. The deletion of this personal information reflects Fortin’s and Beauclair’s understanding that personal emails on the Company’s computer system were intended to remain personal, and should not be accessed by TransOcean or GIH.

Fortin testified in his deposition that the reference to “counsel” in this email refers to Batter and himself. This Court does not credit that testimony: he plainly is referring to the advice he received from Batter, not advice he gave himself.