## Commonwealth vs. Henry Juan Williams.

Suffolk. April 11, 2003. - July 1, 2003.

Present: Marshall, C.J., Greaney, Cowin, Sosman, & Cordy, JJ.

*Grand Jury. Probable Cause. Evidence,* Blood sample. *Search and Seizure,* Blood sample. *Constitutional Law,* Search and seizure. *Practice, Criminal,* Instructions to jury, Capital case.

In a murder case, the judge did not err in allowing the grand jury's petition for a preindictment order compelling the defendant to produce hair, blood, and saliva samples, where the information supporting the petition was adequate to establish probable cause to detain the defendant [682-684]; where the petition, although not signed by the foreperson under oath or supported by an affidavit as required under the circumstances, was not so defective as to create a substantial likelihood of a miscarriage of justice [684-685]; where the order, although lacking findings regarding a reasonable basis for believing that the evidence sought would significantly aid the grand jury's investigation, or any reference to a weighing of the considerations enumerated in *Matter of Lavigne,* 418 Mass. 831 (1994), was presumed to be supported by the appropriate factual determinations and legal analysis, particularly when a hearing preceded the order's issuance [685-686]; and where the order did not unconstitutionally authorize the use of unlimited force to obtain samples from the defendant, and there was no indication that any physical force at all was used to obtain samples [686].

At a murder trial, the judge complied fully with *Commonwealth v. Bowden,* 379 Mass. 472 (1980), in not removing the adequacy of the police investigation from the jury's consideration. [687]

Indictments found and returned in the Superior Court Department on October 7, 1994.

A preindictment hearing on a petition for an order directing the defendant to provide samples of hair, blood, and saliva was had before *Thomas E. Connolly,* J.; and the cases were tried before *Robert A. Mulligan,* J.

*Chrystal A. Murray* for the defendant.

*John P. Zanini,* Assistant District Attorney, & *Amanda Lovell,* Assistant District Attorney, for the Commonwealth.

Cordy, J. Following a jury trial, Henry Juan Williams was

convicted of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder (the underlying felony being either armed robbery or attempted armed robbery), as well as armed assault with intent to rob. In his appeal, Williams argues that the preindictment order compelling him to produce hair, blood, and saliva samples was fatally flawed, and that the trial judge erred by not giving the jury a so-called *Bowden* instruction. *Commonwealth* v. *Bowden*, 379 Mass. 472 (1980). We also reviewed the entire proceedings pursuant to G. L. c. 278, § 33E. We see no reason to overturn Williams's convictions or grant any other relief.

*Background.* Zachariah Johnson was seventy-one years old. He lived at 293 Washington Street in the Dorchester section of Boston. At noon on March 13, 1994, detectives found his body in an alley between 289 and 291 Washington Street, lying next to a chain link fence. A butcher knife was embedded in his chest. He had been stabbed approximately twelve times in the chest, neck, face, and hands; his ring finger bore a deep laceration just above a gold ring which had been twisted (but not removed); his left pants pocket had been pulled inside out; a dollar bill and some change lay on the ground near his body; a nearby window was smashed and broken glass lay scattered on the ground. There were bloodstains all around, including on the walkway leading from the alley toward Washington Street and on the sidewalk in front of 293 Washington Street leading in the general direction of Westville Street.

A criminalist from the Boston police crime laboratory, Mary Corey, arrived on the scene and collected and catalogued many of the blood stains and other physical evidence. Over the next two days Corey received more material from the medical examiner's office, including samples of Johnson's blood, fingernail clippings, and head and pubic hair; the clothing Johnson was wearing when he was killed; and the knife that had been embedded in Johnson's chest. Antigen typing revealed Johnson had type O blood, and blood samples recovered from the scene included both type O and type A blood.

During their investigation, the police learned that Williams was an acquaintance of Johnson, a frequent visitor to his home,

and lived three blocks away in a rooming house at 24 Westville Street. They also learned that a resident of 295 Washington Street heard a man screaming "help" at 3:30 A.M. on March 13. Further investigation led the police to Innocent Obi, a then resident of the rooming house at 24 Westville Street. Obi told them that between 4 and 6 A.M. on March 13, he was awakened by Williams's repeated and loud knocking on the window to his room. Williams begged Obi to let him in, so Obi opened the door to the building. Obi observed that Williams had a jacket over his shoulder, his T-shirt was spattered with blood, his right hand was wrapped in a blood-soaked white cloth, and he appeared out of breath and hysterical, as if someone were chasing him. Williams told Obi he had cut his hand jumping over a fence and asked if he could stay in Obi's room. Obi refused, so Williams went to his own room.

The investigation also revealed that Williams left the rooming house later that morning and never returned to it, traveling to Florida and then Honduras. He was arrested when he later returned to Massachusetts.

In October, 1994, a Suffolk County grand jury began hearing evidence of Johnson's murder and Williams's possible involvement. On October 12, the grand jury filed a petition in the Superior Court for an "Order Directing Juan Henry Williams to Provide Samples of His Hair, Blood and Saliva."[1] The petition recited evidence heard by the grand jury, including that type A blood was found at the crime scene, along with Johnson's blood, which was type O; blood drops trailed from the scene in the direction of the building where Williams lived at the time; Williams was known to frequent Johnson's home; Williams was observed highly agitated early in the morning of March 13, right after the murder, bleeding profusely from his hand, which

---

[1]There is some confusion as to Williams's name. In the grand jury's petition and the resulting court order, he is referred to as "Juan Henry Williams." In all other instances, including in the indictments, he is referred to as "Henry Juan Williams," occasionally followed with "otherwise known as Preston Williams." As is our custom we recite the defendant's name as it first appears on the indictments. See *Commonwealth* v. *Adams*, 434 Mass. 805, 806 n.1 (2001). It is undisputed that Henry Juan Williams and Juan Henry Williams are the same person — the defendant in this case.

he said had been cut on a fence; and Williams fled to Florida and then Honduras.

Williams received notice of the petition and opposed it on the grounds that it violated his right not to incriminate himself, an argument he does not pursue on appeal.[2] Following a hearing, a Superior Court judge granted the petition and ordered Williams to provide the samples. The order specifically allowed that, "[i]f the defendant should resist, the representatives of the Commonwealth are authorized to physically restrain Juan Henry Williams as much as is necessary to procure the samples."

Immediately thereafter, blood and saliva samples were taken from Williams (apparently without any need for physical restraint) in the presence of defense counsel. Antigen typing of the blood samples revealed Williams's blood to be type A. Previous antigen typing by the Boston police crime laboratory had detected type A blood in samples collected from the sidewalk in front of 293 Washington Street; the walkway leading from the alley to the sidewalk; the chain link fence in the alley; the knife handle; the bottom of Johnson's sweatshirt; Johnson's left pants pocket; the dollar bill; the back porch (including the stairs, post, and doorknob); and the windows in the alley.

The Boston police crime laboratory sent samples of Williams's blood, of Johnson's blood, and of blood found at the scene to the Center for Blood Research Laboratory and the laboratory of the Federal Bureau of Investigation for DNA testing. This testing revealed the presence of DNA consistent with Williams's DNA in the samples of type A blood taken from the crime scene. With respect to those samples from which the most complete comparisons could be made, the probability of a person unrelated to Williams having the same genetic profile was determined to be between 1:900,000 and 1:1,100,000 African-Americans, 1:30,000,000 Caucasians, and 1:32,000,000

---

[2]In the Superior Court proceedings, Williams conceded that the petition set forth "probable cause" to obtain the evidence. It is not clear from the transcript whether this was a concession that the petition set forth "probable cause" to believe that Williams committed the crime or "probable cause" to believe that the evidence sought would aid in the grand jury's investigation. See discussion *infra*.

Southeastern Hispanics. The results of the DNA testing and antigen typing were admitted at trial.[3]

*Discussion.* The claims of error that Williams raises in his appeal regarding defects in the preindictment order were not raised at trial. Consequently, we review them to determine whether there was error, and if so, whether such error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Gentile*, 437 Mass. 569, 575 n.1 (2002). Because an objection was timely made to the judge's refusal to give a so-called *Bowden* instruction, we review that claim for prejudicial error.

1. *The preindictment order for hair, blood, and saliva samples.* Williams claims that the preindictment order was unlawful for three reasons: first, the grand jury's petition was substantively defective because the information supporting it was neither shown to be reliable nor adequate to establish probable cause to detain him; second, the petition was inadequate in form because it was not signed by the foreperson under oath; and third, the order failed to include judicial findings required by *Matter of Lavigne*, 418 Mass. 831, 836 (1994).

We begin with a discussion of the requirements for such an order set forth in *Matter of a Grand Jury Investigation*, 427 Mass. 221, 222, 225, cert. denied sub nom. *A.R.* v. *Massachusetts*, 525 U.S. 873 (1998), in which we considered a similar petition by a grand jury for a court order directing two individuals to submit to blood testing. In that case, we concluded that the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights required that "[a] grand jury . . . have a reasonable basis for believing (have probable cause for believing, if you wish) that a blood sample will provide test results that will significantly aid . . . the grand jury in their investigation of circumstances in which there is good reason to believe a crime has been committed." *Id.* at 226. In adopting this standard, we rejected the view that it was necessary for the grand jury to support their request by a showing of probable cause to believe that the defendant committed the crime they were investigating, *id.* at 225, a require-

---

[3]This case was previously before this court on an interlocutory appeal concerning the admissibility of DNA testing. *Commonwealth* v. *Vao Sok*, 425 Mass. 787 (1997).

ment that we had previously set for search warrant applications seeking the same type of blood-related evidence from individuals who were neither charged with an offense nor under grand jury investigation. *Matter of Lavigne, supra* at 836.

Our conclusion rested in part on the unique role of the grand jury in our criminal justice system as an investigatory body with broad powers to "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *Matter of a Grand Jury Investigation, supra* at 226, quoting *United States* v. *R. Enters., Inc.*, 498 U.S. 292, 297 (1991). "Given that a grand jury must find probable cause to indict, it would be peculiar to require them to demonstrate the same degree of probable cause to believe that a target of their investigation committed a crime before the grand jury could properly obtain evidence in aid of their investigation." *Matter of a Grand Jury Investigation, supra* at 225, citing *United States* v. *R. Enters., Inc., supra.*

We also noted that the process by which the grand jury sought the order afforded their target important protections unavailable, for instance, in the ex parte process of obtaining a search warrant, including notice of the petition seeking the order and an opportunity to be heard by the court before its issuance. *Matter of a Grand Jury Investigation, supra* at 226-227 n.4. Those same protections were afforded in the present case. Williams asks us to reconsider and overrule that decision. We see no basis for doing so.

Turning to the substance of the petition, the information set forth therein fully satisfied the requirement that the grand jury have a "reasonable basis for believing" that the blood sample would "significantly aid" their investigation into Johnson's murder. It is readily apparent from the petition that there was a basis for investigating Williams's possible involvement in the crime, and whether the blood found at the scene of the murder was similar or identical in type to Williams's blood would be highly probative of his presence and participation in the crime. This was not a request predicated on a hunch, a guess, or a shot in the dark.

Williams argues that the evidence heard by the grand jury and used in support of a petition such as this should be subjected

to a reliability test, similar to that in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). This argument is misplaced. The *Aguilar-Spinelli* standard relates to the reliability of information from unnamed sources used by police to establish probable cause for the purpose of obtaining search warrants. *Aguilar* v. *Texas, supra. Spinelli* v. *United States, supra.* See *Commonwealth* v. *Upton*, 394 Mass. 363, 374-376 (1985). It has no applicability to grand jury proceedings or to evidence gathered by the grand jury in the course of their investigation.[4]

We turn next to the adequacy of the form of the petition. It is undisputed that the petition was authorized by the grand jury, accurate in its particulars, and signed by the foreperson. It was not, however, signed under oath. This court has never considered whether a petition filed by a grand jury must be under oath or supported by a sworn affidavit. We conclude that it must be when the approval sought is dependent on a showing of a "reasonable basis for believing" that the evidence sought will significantly aid the grand jury in their investigation. This requirement is minimally necessary considering the important interests at stake, and is consistent with the requirement that pretrial motions relying on facts be supported by affidavit, Mass. R. Crim. P. 13 (a), 378 Mass. 871 (1979), and that affidavits be submitted in support of search warrant applications, G. L. c. 276, § 2B. It can be met by the filing of a verified petition or an affidavit from the prosecutor or a member of the grand jury, or by the submission of grand jury testimony.[5]

Williams waived the requirement of an oath by failing to object to its absence. We therefore review the error to determine whether it created a substantial likelihood of a miscarriage of

---

[4]We do not mean to suggest, however, that a judge, in considering such a petition, cannot inquire into the basis or the "reasonableness" of the basis on which the grand jury are relying.

[5]The court recognizes that there will be occasions when only a summary (and perhaps only a partial summary) of the relevant evidence may be set forth in a petition, where there is danger that the investigation might be prematurely compromised by further or more specific disclosures. If the prosecutor is called on by the judge to elaborate, the judge may consider any such elaboration (whether under oath or provided by the prosecutor as an officer of the court with firsthand knowledge of the evidence presented to the grand jury) in his or her discretion in ruling on the petition.

justice. *Commonwealth* v. *LaCava*, 438 Mass. 708, 724 n.17 (2003). There is no such likelihood here. The defect was of no substance and could readily have been remedied if timely raised.

Finally, we turn to the hearing itself, and the judge's order allowing the petition. Presented with a petition from the grand jury, the judge must hold a hearing before deciding whether to order the extraction of the samples and, as noted above, must be satisfied that there is a "reasonable basis for believing" that the blood sample will "significantly aid" the grand jury's investigation. Williams contends that the judge must also weigh other considerations, and that the judge's order reflected neither the required finding of a "reasonable basis" nor such a weighing. This argument appears to be based on language contained in *Matter of Lavigne*, 418 Mass. 831, 836 (1994). In that case, which involved an application for a search warrant, we stated that the Commonwealth needed to establish "probable cause" (not relevant here) and that the evidence sought would aid in the investigation before authorizing the warrant, and also that, in considering the application, the judge "must weigh the seriousness of the crime, the importance of the evidence to the investigation, and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other." *Matter of Lavigne, supra* at 836 (citation omitted). In *Matter of a Grand Jury Investigation*, 427 Mass. 221, 224 (1998), the issue of additional considerations was not directly before the court, but we noted "[o]ther considerations point[ing] to the allowance of the grand jury's request," including the minimal degree of bodily intrusion, the high degree of relevance of the evidence on the question of guilt or innocence, and the lack of a better source for evidence of such strength. We view these considerations to be in essence the same as those enumerated in *Matter of Lavigne, supra* at 836, and appropriate for the judge to weigh in ruling on petitions like the one at issue here.

The judge held a hearing on October 17, 1994, and, at its conclusion, signed a one paragraph order. See note 3, *supra*. The order does not include any findings, nor does it make refer-

ence to the considerations noted above.[6] These omissions, however, are not fatal. Absent a showing of abuse of discretion or clear error, we presume a judge's order to be supported by the appropriate factual determinations and legal analysis. See *Commonwealth* v. *Lanoue*, 392 Mass. 583, 588 (1984), *S.C.*, 400 Mass. 1007, and 409 Mass. 1 (1990) (absent subsidiary factual findings, judge presumed to have assessed credibility in denying motion to suppress). Such a presumption is particularly appropriate where the judge's order was preceded by a hearing at which only one objection (self-incrimination) was interposed by the defendant (and rejected at the hearing), and the record before the court plainly supports both a finding of a "reasonable basis for believing" that the evidence sought would significantly aid the investigation and the conclusion that any weighing of the relevant considerations would tilt heavily in favor of the petition. Here, the crime was murder; the evidence sought was vital to the investigation; and the degree of bodily intrusion required to obtain the evidence was minimal. See *Matter of a Grand Jury Investigation, supra* at 224. There was no error.

Williams also claims that the preindictment order was unconstitutional because it authorized the use of unlimited force to obtain the samples. Specifically, the order stated that "[i]f the defendant should resist, the representatives of the Commonwealth are authorized to physically restrain Juan Henry Williams as much as is necessary to procure the samples." Such language is not unconstitutional. Courts are not required to prescribe with exactitude the particular degree of force to be used in executing warrants or carrying out orders. See *Commonwealth* v. *Garner*, 423 Mass. 735, 745-746 (1996). Such a requirement would be entirely unworkable where the degree of resistance and sundry other circumstances cannot be predicted. Instead, law enforcement personnel are authorized to use reasonable force, and no more, to execute warrants and carry out lawful orders. Moreover, there is no indication that any physical force at all was used to obtain samples from Williams. Rather, he submitted to the sampling in the presence of his attorney.

---

[6] We note that the hearing was held and the order entered one month before this court decided *Matter of Lavigne*, 418 Mass. 831 (1994), and four years before *Matter of a Grand Jury Investigation*, 427 Mass. 221, cert. denied sub nom. *A.R.* v. *Massachusetts*, 525 U.S. 873 (1998).

2. *The* Bowden *instruction.* Much of Williams's defense was directed at the reliability of the DNA test results and focused on arguable flaws in both the procedures used to gather the blood evidence from the scene and the methods used to store that evidence prior to testing. Having challenged the adequacy of the police investigation, Williams argues that he was entitled to a so-called *Bowden* instruction, advising the jury, in essence, that if they found law enforcement failed to properly collect and preserve evidence, such a finding might itself raise a reasonable doubt as to the defendant's guilt.[7] See *Commonwealth* v. *Bowden,* 379 Mass. 472, 485, 486 (1980). The judge declined to give the instruction. There was no error because the giving of such an instruction is never required. In other words, there is no *Bowden* instruction.

"As we have stated many times . . . a judge is not required to instruct on the claimed inadequacy of a police investigation. '*Bowden* simply holds that a judge may not remove the issue from the jury's consideration.' " *Commonwealth* v. *Boateng,* 438 Mass. 498, 506-507 (2003), quoting *Commonwealth* v. *O'Brien,* 432 Mass. 578, 590 (2000). In this case, the judge did not remove the inadequacy of the police investigation from consideration by the jury and so complied fully with *Bowden*'s only requirement.

3. *G. L. c. 278, § 33E.* We have reviewed the entire record of the proceedings in this case as is our responsibility pursuant to G. L. c. 278, § 33E, and see no basis for exercising our authority to reduce the jury's verdict of guilty of murder in the first degree or to grant Williams any other relief.

*Judgments affirmed.*

---

[7]Williams requested that the judge give an instruction that stated in relevant part: "In considering whether the Commonwealth has proven the charges against the defendant beyond a reasonable doubt, you may consider . . . whether the Commonwealth failed to collect and preserve the evidence properly . . . . I instruct you that if you find that the authorities unreasonably failed . . . to properly collect and preserve the evidence in this case . . . such a finding may raise a reasonable doubt as to the defendant's guilt." The judge declined to give the instruction, to which Williams objected.